**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **11-02611-hb**

**ORDER ON OBJECTION TO CONFIRMATION AND OBJECTION TO CLAIM**

The relief set forth on the following pages, for a total of 20 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**09/16/2011**



US Bankruptcy Judge
District of South Carolina

Entered: 09/19/2011

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: | C/A No. 11-02611-HB |
| | Chapter 13 |
| David P. Krueger, | **ORDER** |
| Debtor(s). | |

THIS MATTER came before the Court for hearing upon the *Objection to Confirmation of the Chapter 13 Plan*[1] filed by Kathryn Long-Krueger ("Creditor") and the *Amended Objection to Claim*[2] filed by David P. Krueger ("Debtor"). The dispute in this matter turns on whether the Debtor's assumptions of debts in an agreement between the former spouses results in domestic support obligations ("DSO"), as defined by the Bankruptcy Code under 11 U.S.C. § 101(14A).[3] In her Objection to Confirmation, Creditor asserts that Debtor's obligations under the agreement constitute DSOs and that Debtor's Chapter 13 plan should classify such obligations as priority claims under § 507(a)(1)(A) or (B) and propose to pay them accordingly. Debtor objects to Creditor's classification of her filed claim as priority.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Local Civil Rule 83.XI.01, DSC. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (C), and (L) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] Doc. No. 13, filed April 28, 2011.
[2] Doc. No. 17, filed May 20, 2011.
[3] Further reference to the Bankruptcy Code, 11 U.S.C. § 101 *et. seq.*, will be by section number only.

1

**FINDINGS OF FACT:**

1. Debtor and Creditor were married on March 2, 1990, and separated in December 2007.[4]

2. Throughout their marriage, the parties resided at 148 Galerie Drive, Easley, South Carolina 29642 ("Marital Residence"). Creditor and the parties' three children continue to live there.

3. The parties executed a Complete Custody & Property Settlement Agreement[5] ("Separation Agreement") on November 19, 2008, which was adopted and made part of the Final Order Approving Settlement Agreement and Decree of Divorce[6] ("Divorce Decree") on March 27, 2009.

4. The parties have three children born of the marriage, aged ten (10), twelve (12), and fifteen (15) at the time of the Separation Agreement. At the time of the bankruptcy hearing, they were thirteen (13), fifteen (15), and eighteen (18) years old.

5. Throughout the divorce proceeding and during discussions involving the Separation Agreement, Creditor was represented by counsel and Debtor was *pro se*.

6. The Separation Agreement, drafted by Creditor's counsel, states that she "anticipat[es] earning a yearly gross income of $1,084.20 per month[,]" and that Debtor "is currently self-employed, earning a gross yearly income of approximately $7,500.00 per month."[7]

7. Creditor testified that she was employed by Bank of America earning approximately $12.51 per hour at the time of the Separation Agreement. She also

---

[4] Jt. Ex. B at 2, ¶ 3.
[5] Jt. Ex. A.
[6] Jt. Ex. B.
[7] Jt. Ex. A at 1, ¶ 4.

testified that she was working approximately thirty (30) hours a week; thus, generating a gross monthly income of approximately $1,501.20. At the time of the Separation Agreement, she was on leave under the Family Medical Leave Act (FMLA) to attend to her daughter's medical condition. Under the FMLA, Creditor was still employed with benefits, but without a salary.

8. The Separation Agreement included the following relevant provisions under the "Real Property" label:

> The parties acknowledge that they own the residence located at 148 Galerie Drive in Easley, SC 29642, herein after referred to as "marital residence." The parties agree Wife shall have sole use and possession of the marital residence. Further, Wife shall have the right to reside in the marital residence for so long as she desires. . . .
> . . . .
> c.   *While Wife resides in the marital residence and until such time as it is sold, Husband shall be responsible for the payment of the mortgage, equity line, taxes and insurance for the marital residence.* Accordingly, Husband shall be entitled to any tax deductions resulting from the aforementioned payments.
> d.   The parties agree that *in the event Wife co-habitats with a paramour for more than 90 consecutive days, Husband shall no longer be obligated to pay for the mortgage and equity line* for the parties' marital residence.[8]

9. At the hearing on this matter, Debtor testified that he approved of the provision terminating his obligation "in the event Wife co-habitats with a paramour for more than 90 consecutive days . . ." because it would deter Creditor from allowing third parties access to the Marital Residence with their three children. Creditor did not testify as to her intention for including this provision in the Agreement.

10. Under the "Minor Child: Custody & Visitation" label of the Separation Agreement, the parties agreed to "joint custody of their minor children, with their

---

[8] *Id.* at 2-3 ¶ 11.

3

primary residence being with Wife."[9] However, Debtor testified at the hearing on this matter that, despite the fact that the children's primary residence is with Creditor, Debtor did not intend for the children to remain there permanently and he hoped to share their time between the Marital Residence and his new residence.

11. Under the "Child Support" label of the Separation Agreement, the parties agreed that Debtor shall pay child support to Creditor according to the South Carolina Child Support Guidelines, which amounted to $1,500.00 per month.[10]

12. The Separation Agreement includes the following relevant provision under the "Vehicle" label:

> The parties agree Wife shall have sole use and possession of the vehicle currently in her possession and she shall be solely responsible for the insurance associated therewith. *Husband shall be responsible for paying the indebtedness for Wife's vehicles until the debt for Wife's vehicle is paid in full.* . . . [11]

This provision was supplemented by an Addendum to Vehicles executed by the parties on November 28, 2008.[12] The Addendum states that:

> The parties agree due to the current mechanical issues of the vehicle that the Wife is currently in possession of an the manufacturer[']s [sic] warranty ending in less than 1,000 miles the Wife is able to trade the current vehicle for a new vehicle with a 10 year, 100,000 miles warranty. *Husband[']s [sic] current payment arrangement will continue to be the same as on the Wife's original car for the remainder of the months; that would be 49 months at $371.14 per month.* The wife will pay any amount over that and continue with the monthly payments on the contract that extend past the Husband[']s [sic] 49 payments. . . . [13]

13. Under the "Debts and Other Obligations" label, the Separation Agreement states that "[t]he parties agree neither shall incur any additional debt in the parties' joint

---

[9] *Id.* at 3, ¶ 12.
[10] *Id.* at 4-5, ¶ 14.
[11] *Id.* at 6, ¶ 18 (emphasis added).
[12] KLK Ex. 1.
[13] *Id.* (emphasis added).

names or in the other's individual name [and that they] agree each shall be solely responsible for the payment of the debts in their individual names."[14]

14.     The Settlement Agreement has a separate "Alimony" label which states that "[t]he parties agree Husband shall pay permanent periodic alimony unto Wife in the amount of $1,000.00 per month. . . . Upon the parties' youngest child reaching the age of 18 years old, Husband['s] [sic] child support obligation shall cease and his alimony obligation shall be $2,000.00 per month."[15]

15.     The parties' "Representation by Counsel" section states that:

The Wife has been represented by Jessica Salvini, Esquire, of Pickens, South Carolina in the preparation of this Agreement. . . .The Husband is not currently represented, in the negotiation of this Agreement and he has been fully advised as to his right to obtain counsel. *Husband did not retain the services of an attorney at his own election to avoid paying additional attorney's fees.*[16]

16.     A hearing to approve the Settlement Agreement was held on February 27, 2009, at the Family Court for Pickens County, South Carolina. The family court judge presiding over the hearing asked Debtor if he read the Settlement Agreement, understood what it said, and reached the agreement at his own free will, to which Debtor gave affirmative replies.[17]  The judge also asked Debtor if he believed the Settlement Agreement was fair, and Debtor responded that he did not because of certain financial issues.[18] The judge explained to Debtor that if he did not believe the Agreement was fair, then they must have a contested trial at a later date.[19] However, after this explanation,

---

[14] Jt. Ex. A at 7, ¶¶ 25-26.
[15] *Id.* at 7-8, ¶¶ 30-31.
[16] *Id.* at 8, ¶ 35 (emphasis added)
[17] Jt. Ex. C at 2, ln. 10-25.
[18] *Id.* at 3, ln. 2-11.
[19] *Id.* at 3, ln. 12-25; *see also id.* at 4, ln. 1-11.

5

Debtor agreed to move forward with the uncontested hearing on the Settlement Agreement.[20]

17. The documents in question recognized that Debtor's conduct had supplied legal grounds for the granting of a divorce to Creditor.

18. With regard to the Settlement Agreement, the family court judge found as follows in the Divorce Decree:

> b. This Court considers the agreement entered into between the parties to be fair and equitable and in the best interest of their minor children.
> c. I find that the agreement reached by the Plaintiff and Defendant was entered into by them freely and voluntarily, without duress or coercion. I find that the agreement is the product of arm length negotiations and is considered by the parties to be fair and reasonable under all relevant circumstances.
> d. I find and conclude that Plaintiff and Defendant were each fully aware of these proceedings and of their respective rights and responsibilities, and that they were fully capable of understanding the terms and conditions of their agreement.[21]

19. More than two years after the parties' divorce, Debtor filed a voluntary petition for Chapter 13 relief on April 20, 2011.

20. Creditor filed Proof of Claim 1-1 ("POC") for $213,241.10 on April 28, 2011. The POC indicates that the basis for the claim is "court orders" and the claim is entitled to priority status a DSO under § 507(a)(1)(A) or (B).[22] The *Attachment to Proof of Claim* states that the "court orders" serving the basis for the claim are the Separation Agreement and Divorce Decree.[23] The Attachment also itemizes the claim as follows:

> The debtor's obligation under the Marital Residence Terms is to pay the first mortgage monthly payment of $1,225.77 for the remaining 146 months of the loan for a total of $178,962.42.

---

[20] *Id.* at 4, ln. 12.
[21] Jt. Ex. B at 3, ¶ 6.
[22] KLK Ex. 2.
[23] *Id.*

6

> The debtor's obligation under the Marital Residence Terms is to pay the line of credit monthly payment of approximately $342.07 for the remaining approximately six years (72 monthly) for a total of approximately $24,629.04.
>
> The debtor's obligation under the Vehicle Terms is to pay $371.14 per month with 26 payments remaining for a balance of $9,649.64.[24]

The sum of these three amounts is $213,241.10.[25]

21. Debtor filed an Amended Objection to Proof of Claim on May 20, 2011[26], asserting that Creditor's claim should not be classified as a priority claim because it does not constitute a DSO under § 507(a)(1)(A) or (B).

22. Until the date of filing, Debtor was current on his child support, alimony, and vehicle payments to Creditor. However, Creditor asserted in her POC that at that time Debtor was $3,677.31 in arrears on the mortgage payment and $671.74 in arrears on the line of credit payments.[27]

23. The parties filed a joint Federal Tax Return for 2008.[28] On the tax return, Debtor indicated that his annual income was $77,403[29], which is approximately $6,450.25 gross monthly income. It is not readily apparent whether any of this income was attributable to Creditor.

24. Debtor filed individual Federal Tax Returns for 2009 and 2010.[30] Debtor's 2009 Federal Tax Return stated that his annual income was $66,392[31], or

---

[24] *Id.*
[25] These amounts include the interest payments on the loans.
[26] Doc. No. 17 (amending Doc. No. 15, filed on May 18, 2011).
[27] KLK Ex. 2.
[28] KLK Ex. 4.
[29] From the $77,403 annual income, the 2008 Federal Tax Return stated that $36,443 was from wages, salaries, etc. and $40,960 was from rental real estate, royalties, partnerships, S corporations, trusts, etc. *Id.*
[30] KLK Ex. 5 & 7.
[31] From the $66,392 annual income, the 2009 Federal Tax Return stated that $31,100 was from wages, salaries, etc., $736 was from taxable refunds, credits, or offsets of state and local income taxes, and $34,556 was from rental real estate, royalties, partnerships, S corporations, trusts, etc. (KLK Ex. 5).

7

approximately $5,532.66 gross monthly income. Debtor's 2010 Federal Tax Return indicated that his annual income was $70,661[32], amounting to approximately $5,888.41 gross monthly income.

25.    In his 2009 and 2010 Federal Tax Returns, Debtor claimed $13,454 in alimony paid to Creditor. Therefore, his adjusted gross income was $52,938, for 2009 (approximately $4,411.50 per month) and was $57,207 for 2010 (approximately $4,767.25 per month).[33] However, Debtor's Schedule I[34] states that Debtor's combined average monthly income amounts to $5,364, or approximately $64,368 annually.

26.    Debtor admitted at the hearing on this matter that he has received tax deductions by claiming the mortgage interest payments for the Marital Residence.

27.    Creditor filed individual Federal Tax Returns for 2009 and 2010.[35] Creditor's 2009 Federal Tax Return states that she made $25,543[36], $9,000 of which was attributed to the alimony she received from Debtor.[37] Including the alimony payments, Creditor's approximate gross monthly income was $2,128.58. Her 2010 Federal Tax return indicated that her annual income was $18,508[38], with $12,000 attributable from

---

[32] From the $70,661 annual income, the 2010 Federal Tax Return stated that $32,014 was from wages, salaries, etc., $297 was from capital gain, and $36,574 was from rental real estate, royalties, partnerships, S corporations, trusts, etc. (KLK Ex. 7).
[33] KLK Ex. 5 & 7.
[34] Doc. No. 1, filed on April 20, 2011.
[35] KLK Ex. 6 & 8.
[36] From the $25,543 annual income, the 2009 Federal Tax Return stated that $7,222 was from wages, salaries, etc., $11 was from taxable interest, $721 was from taxable refunds, credits or offsets of state and local income taxes, $9,000 was from alimony received, $7,000 was from IRA distributions, and $1,589 was from pensions and annuities. (KLK Ex. 6).
[37] *Id.*
[38] From the $18,508 annual income, the 2010 Federal Tax Return stated that $3,304 was from wages, salaries, etc., $12,000 was from alimony received, $16 was from pensions and annuities, and $3,188 was from unemployment compensation. (KLK Ex. 8).

Debtor's alimony payments.[39]  Including Debtor's alimony payments, Creditor's approximate gross monthly income was $1,542.22.

28.  Debtor's initial Financial Declaration[40] in the family court indicated that he earned $7,500.00 per month. However, Debtor testified that this amount was incorrect and, in fact, he has never earned $7,500.00 per month.

29.  Debtor's Schedule D lists three secured claims: Bank of America holding claims for $101,111.00 and $22,805.00, both secured by the Marital Residence; and Wells Fargo Home Mortgage holding a claim for $77,000.00, secured by Debtor's current residence.[41] Schedule F states that he owes Creditor $8,165.08 for "payment of a car—not a domestic support obligation debt (22 payments of $371,14)."[42]

30.  Debtor filed his Chapter 13 plan on April 20, 2011.[43]  Pursuant to the proposed plan, Debtor agreed to surrender the Marital Residence upon confirmation. Such treatment would lift the stay for Bank of America by operation of the standard form plan terms. Bank of America's mortgage and equity line are secured by the Marital Residence.[44]

### DISCUSSION AND CONCLUSIONS OF LAW:

A Chapter 13 plan must provide for payment, in full, of all claims entitled to priority under § 507. *See* 11 U.S.C. § 1322(a)(2) (West 2011).[45] Under the Code, claims for DSOs owed to a former spouse are entitled to first priority. *See* 11 U.S.C.

---

[39] *Id.*
[40] DR Ex. CC.
[41] Doc. No. 1 at 16.
[42] *Id.* at 19.
[43] Doc. No. 2.
[44] *Id.* at Sec. IV(B)(6).
[45] Under Chapter 7, both DSOs and debts arising from a property settlement or an equitable distribution award are nondischargeable. 11 U.S.C. § 523(a)(5) and (15). However, equitable distribution awards are dischargeable in Chapter 13, 11 U.S.C. § 1328(a)(2), and DSOs are entitled to priority status and must be paid in full under the plan. 11 U.S.C. §§ 507(a)(1) and 1322(a)(2).

9

§507(a)(1)(A) and (B). A "domestic support obligation" is defined by the Code as a debt "owed to or recoverable by a . . . former spouse, or child of the debtor" that is "in the nature of alimony, maintenance, or support . . . of such . . . former spouse, or child of the debtor . . . without regard to whether such debt is expressly so designated" that was "established . . . before . . . the date of the order for relief . . . by reason of applicable provisions of a separation agreement, divorce decree, or property settlement agreement; [or] an order of a court of record." 11 U.S.C. § 101(14A).

"The determination of whether an award arising out of marital dissolution proceedings was intended to serve as an award for alimony, maintenance or support, or whether it was intended to serve as a property settlement is a question of fact to be decided by the bankruptcy court." *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604, 608 (B.A.P. 8th Cir. 1997). Whether an obligation is in the nature of support and qualifies as a DSO is a question of federal law. *Id.* In determining whether an obligation constitutes a DSO, the Court looks to the interpretation of DSOs in case law involving the dischargeability of debts under § 523(a)(5), as enacted prior to the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA). *In re Dudding*, No. 10-10557, 2011 WL 1167206, at *5 (Bankr. D. Vt. Mar. 29, 2011).[46] Before BAPCPA, § 523(a)(5) excepted from discharge debts to a former spouse "for alimony to, maintenance for, or support of such spouse . . . but not to the extent . . . such debt includes a liability

---

[46] The court in *Dudding* explained this approach for analyzing DSOs as follows:
> Post–BAPCPA, the former § 523(a)(5) was incorporated into the new definition of "domestic support obligation" found in § 101(14A), and the shorter "domestic support obligation" became the new § 523(a)(5). Therefore, pre-BAPCPA § 523(a)(5) cases examining whether a debt was "in the nature of alimony, maintenance, or support" are relevant and inform the Court's analysis of whether the . . . debt is a domestic support obligation.

*In re Dudding*, No. 10-10557, 2011 WL 1167206, at *5 (Bankr. D. Vt. Mar. 29, 2011) (citing *In re Boller,* 393 B.R. 569, 574–75 (Bankr. E.D. Tenn. 2008)).

10

designated as alimony, maintenance, or support *unless such liability is actually in the nature of alimony, maintenance, or support.*" Former 11 U.S.C. § 523(a)(5)(B) (emphasis added).

In the Fourth Circuit, courts must look beyond the language of the divorce decree to determine the intent of the parties at the time the separation agreement was executed. *See Tilley v. Jessee*, 789 F.2d 1074, 1077-78 (4th Cir. 1986); *see also In re Siegel*, 414 B.R. 79, 81 (Bankr. E.D.N.C. 2009) (stating that if a claim for a DSO "arises from an agreement between the parties, the determining factor is the intent of the parties at the time the agreement was reached."); *In re Poole*, 383 B.R. 308, 314 (Bankr. D.S.C. 2007) ("When deciding whether a debt should be characterized as one for support or property settlement, courts must consider whether the obligation was intended to be one for support." (citations omitted.)). "When the obligation is created by a stipulated dissolution judgment, 'the intent of the parties at the time the settlement agreement is executed is dispositive.'" *In re Nelson*, No. 10-40718-elp13, 2011 WL 1549008, at *2 (Bankr. D. Or. April 22, 2011) (quoting *In re Sternberg*, 85 F.3d 1400, 1405 (9th Cir. 1996), *rev'd on other grounds*, *In re Bammer*, 131 F.3d 788 (9th Cir. 1997)). "To determine the parties' intention, the court must consider not only the terms of the agreement, but also the overall circumstances of the parties." *Siegel*, 414 B.R. at 82. In making such a determination, Courts have employed various multi-factor tests. This Court has previously adopted the following factors as guidance in determining whether an obligation constitutes a DSO:

> (1) the substance and language of the document in question; (2) the financial condition of the parties at the time of the decree or agreement; (3) the function served by the obligation and intent of the parties at the

11

>  time of the agreement; and (4) whether there is evidence to question the intent of a spouse or evidence of overbearing by either party.

*Poole*, 383 B.R. at 314 (citations omitted). In addition, "the tax treatment accorded to the debt may also be significant." *Pagels v. Pagels (In re Pagels)*, Adv. No. 10-07070-SCS, 2011 WL 577337, at *10 (Bankr. E.D. Va. Feb. 9, 2011) (citations omitted).

### BURDEN OF PROOF

The Court heard the Objection to Confirmation and Claim Objection simultaneously. As a result, it is a challenge to determine where the burden of proof lies. The Code establishes a burden-shifting framework for proving the validity and amount of a claim. Initially, "[t]he creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim." *In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004) (citing 11 U.S.C. § 502(a); FED. R. BANKR. P. 3001(f)). After the proof of claim is filed, the burden shifts to the debtor to object to the claim and he "must introduce evidence to rebut the claim's presumptive validity." *Id.* (citing FED. R. BANKR. P. 9017; FED. R. EVID. 301; 4 *Collier on Bankruptcy* at ¶ 501.02[3][d] (Alan N. Resnick & Henry J. Somme reds., 15th ed. Rev. 2004)). If the debtor carries his burden, then the creditor has the ultimate burden of proving the validity and amount of the claim by a preponderance of the evidence. *Id.*

For confirmation matters, "[t]he Debtor bears the burden of proving that the plan meets all of the elements for confirmation found in § 1325." *Poole*, 383 B.R. at 314-15. However, "it is generally accepted that a party objecting to confirmation bears the burden of proof." *Matter of Shortridge*, No. 93-2558, 1995 WL 518870, at *2 (6th Cir. 1995) (citations omitted); *see also In re Petrella*, 230 B.R. 829, 832 (Bankr. N.D. Ohio 1999) (stating that "a party objecting to confirmation bears the burden of proof as to the

objection" (citations omitted)). Ultimately, "[t]he complaining spouse has the burden to demonstrate that the obligation at issue is in the nature of alimony, maintenance, or support." *In re Johnson*, 397 B.R. 289, 296 (Bankr. M.D.N.C. 2008) (citations omitted).

THE SUBSTANCE AND LANGUAGE OF THE AGREEMENT

The first factor to consider when determining whether an obligation constitutes a DSO is the substance and language of the document in question. *See Poole*, 383 B.R. at 314 (citations omitted). The obligations at issue arose from the "Complete Custody & Property Settlement Agreement." Despite the title of the document, it served as the parties' separation agreement and included terms beyond those categories within the title. In addressing this factor, the Court must look to the actual language and the substance of the agreement and "the Court should be cognizant of the context in which the obligation arises under the agreement." *Pagels*, 2011 WL 577337, at *10 (citations omitted).

The Separation Agreement sets forth the mortgage and vehicle obligations separately from the "Child Support" and "Alimony" sections. The fact that the obligations are not included under these headings is noted. However, "[t]he labels attached to certain provisions in a separation agreement are not dispositive of their 'nature,' but the labels are persuasive evidence of the parties' intent." *Johnson*, 397 B.R. at 297 (citations omitted). Therefore, the Court must look beyond the labels within the agreement and to the intended nature of the obligation.

An important aspect of the language contained in the terms of the mortgage obligation is that Debtor's obligation was terminable upon Creditor cohabitating with a paramour for more than ninety (90) consecutive days. "[T]he termination of the obligation upon the remarriage or death of an ex-spouse evidences the shared intention of

13

the parties to create an obligation in the nature of alimony, maintenance, or support . . ." *Pagels*, 2011 WL 577337, at *12 (citations omitted).[47] This is a strong indication that the mortgage obligation was intended as support for Creditor, despite Debtor's retroactive explanation of his approval of this provision. Despite the label applied, the substance of the obligation indicates that it is intended as maintenance or support and not the result of a property division. There are additional conditions found in the Settlement Agreement that could apply to terminate Debtor's continued obligation to pay the mortgage, should Creditor's financial condition change by sale of the house.

On the other hand, the vehicle obligation is not subject to such conditions. This obligation requires Debtor to make the vehicle payments until the debt is paid in full.[48] Establishing the obligation for a fixed period/amount evidences the parties' intent for the vehicle payments to be in the nature of a property settlement, not maintenance or support.

<u>THE FINANCIAL CONDITION OF THE PARTIES AT THE TIME OF THE AGREEMENT</u>

The second factor the court must consider is "the financial condition of the parties at the time of the decree or agreement." *Poole*, 383 B.R. at 314 (citations omitted). "In concluding whether parties shared an intention to create an obligation in the nature of alimony, maintenance, or support, courts find a showing of need for support on the part of the complainant at the time of the agreement persuasive." *Pagels*, 2011 WL 577337, at

---

[47] There is consistent case law setting forth the principle that obligations terminable upon the death or remarriage of the ex-spouse are indicative of maintenance or support and not a property settlement. *See In re Nelson*, No. 10-40718-elp13, 2011 WL 1549008, at *4 (Bankr. D. Or. April 22, 2011) ("The obligation to assume and pay the mortgage does not terminate on [ex-wife]'s death or remarriage . . . This is usually indicative of a property division, not a support obligation."); *In re Lewis*, 423 B.R. 742, 750 (Bankr. W.D. Mich. 2010) (holding that the obligations imposed by a Temporary Order were not "support" and stating that "it is noteworthy that the obligations in the order do not terminate upon a condition subsequent, such as [ex-wife]'s remarriage, death, or qualification for Social Security benefits."); *In re Siegel*, 414 B.R. 79, 82 (Bankr. E.D.N.C. 2009) ("A final factor supporting the court's determination that the obligation is a party of the property settlement is that [debtor]'s payments did not terminate in the event of the remarriage or death of [ex-wife].").
[48] The Addendum to Vehicles did not change the nature of this obligation. *See* KLK Ex. 1.

14

*13 (citations omitted). "Several variables may inform the Court's analysis, such as the prior work experience and abilities of the parties, their physical health, potential earning power and business opportunities, and correspondingly their probable need in the future." *Id.* at *11 (citations omitted).

Although there was minimal testimony about these variables, the evidence submitted by the parties clearly indicated that Debtor earned more and has a greater earning potential than Creditor at the time of the Separation Agreement. The parties' Federal Tax Returns from 2008-2010 confirm that these facts persist. Debtor has earned more than double Creditor's income, even including the alimony she received and excluding this amount from his income. Furthermore, Creditor testified that she was unable to work at the time of the parties' separation because of her daughter's medical condition. She was on a leave of absence from work under the FMLA and, thus, not receiving any salary or wages. Debtor, on the other hand, testified that in previous years he had made even more than his recent income. In fact, Debtor specifically stated that in 2007 he earned more than $100,000; thus, indicating a higher earning potential than Creditor, who was only working part-time for approximately $12 per hour prior to the separation.[49] Under these facts, it is evident that both parties knew Creditor would be unable to remain in the Marital Residence with the children without Debtor's considerable assistance, as outlined in the Settlement Agreement. Examination of the financial conditions of the parties at the time of the Separation Agreement tips the scales

---

[49] Regardless of the discrepancies between the Financial Declaration prepared for the divorce action and Debtor's tax returns for the relevant years, it is beyond this Court's jurisdiction to determine whether the terms of the Divorce Decree were reasonable in light of the Debtor's income. The scope of this Court's review is limited to determining whether the mortgage and vehicle obligations imposed by the Separation Agreement are nondischargeable because they are in the nature of maintenance or support.

toward a finding that Debtor's obligations related to the mortgage and vehicle debts are in the nature of support.

### THE FUNCTION SERVED BY THE OBLIGATION AND THE INTENT OF THE PARTIES AT THE TIME OF THE AGREEMENT

The Court must next address "the function served by the obligation and intent of the parties at the time of the agreement." *Poole*, 383 B.R. at 314 (citations omitted). "An agreement that serves to provide such daily necessities as food, clothing, shelter, and transportation is indicative of debt intended to be in the nature of support." *Pagels*, 2011 WL 577337, at *13 (citations and quotation marks omitted). When analyzing this factor, "[t]he court may consider the length of the marriage, who was at fault in the marriage, and if any children were born from the marriage. . . . Whether the debt is for a past or future obligation, allocates debt, or divides property are also relevant variables." *Id.* at *11 (citations omitted).

> The Court must view this question in light of the circumstances at the time of the Agreement and Divorce Decree, and should not consider changed circumstances of the parties. The key time is the date of the divorce decree because federal courts should not be in the position of modifying the matrimonial decrees of state courts, thus interfering with the delicate state systems for dealing with dissolution of marriages and the difficult and complex results that flow therefrom.

*Dudding*, 2011 WL 1167206, at *9 (internal quotation marks and citations omitted). In addition, courts have previously "ruled that the agreement to provide shelter should be construed as an obligation to provide support." *Johnson*, 397 B.R. at 298 (citing *In re Gianakas*, 917 F.2d 759, 763 (3d Cir. 1990)).

The parties were married for approximately seventeen years prior to their separation and have three children. Debtor's conduct provided the legal grounds for granting Creditor the divorce. The parties' testimony indicated that Creditor needed the

16

payments in order to maintain basic needs of housing and transportation. Consideration of these facts weighs favorably for a finding that the mortgage obligation is in the nature of support.

With regard to the vehicle obligation, it provides Debtor's children and Creditor with transportation for a short period of time while the children remain primarily in Creditor's household. The facts of this case are distinguishable from *Pagels*, 2011 WL 577337, which found that the debtor's obligation to pay a vehicle loan was not in the nature of support. *Id.* at *15. That case involved an indemnity agreement and did not include the facts discussed herein which indicate that the vehicle obligation was intended to meet a basic need that Creditor cannot afford, and therefore, appears to be for her support.

### EVIDENCE OF OVERBEARING BY EITHER PARTY

Turning to the last factor, the Court must consider "whether there is evidence to question the intent of a spouse or evidence of overbearing by either party." *Poole*, 383 B.R. at 314 (citations omitted). In determining whether a spouse's will has been overborne, the Court should consider the following factors:

> whether both parties were represented by an attorney, whether the terms of the agreement grossly favor one spouse over the other or leave one spouse with virtually no income, the statements of the spouses in court, the age, health, intelligence and experience of the spouses, the bargaining positions of the parties, whether there were any misrepresentations, and whether the creditor spouse had knowledge of the debtor spouse's weakness or inability to fulfill the terms of the agreement.

*Kettner v. Kettner*, C/A No. 91-587-N, 1991 WL 549386, at *2 (E.D. Va. Nov. 19, 1991).

Creditor was represented by an attorney throughout the divorce proceeding, Debtor was not. Debtor testified at the hearing in bankruptcy court that he chose not hire

17

his own attorney because he was already paying for Creditor's attorney's fees.[50] Debtor also testified at the hearing in bankruptcy court that the amounts stated on his Financial Declaration made in the family court were incorrect, highlighting his argument that separate counsel in that matter would have better served his needs. If Debtor had reservations about his stated income or the terms of the agreement, he had ample opportunities to address them in the family court and should not have consented to the Separation Agreement. Debtor's mere assertions that the terms were not fair and his regret for consenting to the Agreement, with or without counsel, are insufficient. The record from the family court indicates that the judge there fully explored this issue and there is no evidence to indicate that Creditor was overbearing.

## TAX BENEFITS FROM THE AGREEMENT

An additional factor to consider is whether there are any tax benefits resulting from the Separation Agreement. If the parties do not derive any tax benefit from the obligations imposed by the Agreement, it suggests that the payments are in the nature of a property settlement and not for maintenance or support. *See Siegel*, 414 B.R. at 82. The provision of the Separation Agreement imposing the mortgage obligation specifically states that "Husband shall be entitled to any tax deductions resulting from the [mortgage and equity line payments]."[51] In addition, Debtor testified that he has received tax benefits from his payment of the home mortgage interest; hence, indicating that the mortgage obligation is likely in the nature of support.

---

[50] Creditor's attorney's fees were paid for by the line of credit, which Debtor was obligated to make payments on.
[51] Jt. Ex. A at 3, ¶ 11(c).

18

CONCLUSION

The specific facts of this matter and a weighing of relevant factors applied thereto reveals that the scales tip strongly in favor of a finding that the mortgage obligation imposed by the Separation Agreement is in the nature of support, and sufficiently in the same direction regarding the vehicle obligation. Therefore, the Court finds that Creditor has met her burden of proof to establish that the obligations constitute DSOs.

**IT IS THEREFORE ORDERED:**

1. That the Objection to Claim is **overruled** and the nature of Proof of Claim # 1-1 is correctly classified as a priority debt pursuant to 11 U.S.C. § 507(a)(1)(A).

2. That the Objection to Confirmation of the Chapter 13 plan is **sustained** and confirmation is **denied**.